*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re M. B. MIETTINEN, Minor.

UNPUBLISHED
August 24, 2023

No. 363659
Lenawee Circuit Court
Family Division
LC No. 19-000403-NA

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to the minor child, MBM, under MCL 712A.19b(3)(c)(*i*) and (j). Contrary to respondent's arguments, we conclude that the trial court did not clearly err when it found (1) that clear and convincing evidence supported a statutory ground for termination, (2) that termination of respondent's parental rights was in the child's best interests, and (3) that reasonable efforts were made to preserve the family and reunify respondent with her child. But we must conditionally reverse and remand for further proceedings to ensure compliance with the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*, and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*

## I. BACKGROUND

In 2019, Children's Protective Services (CPS) investigated the family several times for complaints related to domestic violence, physical abuse, and substance abuse. During the investigations, CPS offered respondent preventative services, including housing assistance, counseling services, drug screens, and family team meetings. When respondent refused to cooperate with the services, and CPS concluded that the child was at risk of harm in respondent's care, the Department of Health and Human Services (DHHS) filed a petition requesting that the

-1-

court take temporary custody of the child.[1]  The petition was authorized and eventually respondent was ordered to comply with a treatment plan designed to remove the barriers to reunification.

For more than 2½ years, respondent was offered a multitude of services, but she failed to benefit from the services.  Accordingly, in August 2022, DHHS petitioned the court to terminate respondent's parental rights.  After a termination hearing in October 2022, the trial court found that the statutory grounds to terminate respondent's parental rights were established by clear and convincing evidence and that termination of respondent's parental rights was in the child's best interests.

## II.  ANALYSIS

### A.  STATUTORY GROUNDS

For her first issue on appeal, respondent challenges the trial court's findings regarding the existence of the statutory grounds for termination.  After reviewing the record, we find no merit to respondent's arguments.  In *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), this Court set forth the following framework with respect to termination proceedings:

> If a trial court finds that a single statutory ground for termination has been established by clear and convincing evidence and that it has been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is mandated to terminate a respondent's parental rights to that child. This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests. A finding is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed. When applying the clear error standard in parental termination cases, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.  [Quotation marks, citations, brackets, and ellipses omitted.]

The trial court terminated respondent's parental rights to the child under MCL 712A.19b(3)(c)(*i*) and (j), which permit termination of parental rights under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

---

[1] The child's father was also named as a respondent in the original petition, but he later died during the proceedings.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

We hold that the trial court did not clearly err when it terminated respondent's parental rights under these two statutory grounds.

The evidence demonstrated that CPS investigated respondent several times in 2019 for complaints related to domestic violence, physical abuse, and substance abuse. Respondent admitted that in January 2019, she was found lying in the road with tire tracks across her body and crack cocaine nearby. She also admitted that she stayed in a domestic abuse shelter in April 2019. In November 2019, she was arrested on domestic abuse charges after allegedly striking the child's father in the face while the child was in the home. During the investigations, CPS offered respondent preventative services, including housing assistance, counseling services, drug screens, and family team meetings, but she did not cooperate with these services.

The evidence further established that by mid-November 2019, respondent was unemployed, on the verge of being evicted from her home, and facing domestic violence charges. Respondent's actions again brought her under the scrutiny of CPS. During its investigation, CPS ultimately concluded that because of domestic violence, criminality, substance abuse, and housing instability, the child was at risk of harm in respondent's care. Accordingly, on November 15, 2019, DHHS petitioned the court to take jurisdiction over the child and remove the child from respondent's home. Respondent thereafter entered a plea in which she admitted, among other things, substance abuse, domestic violence in the home, and housing instability. Respondent also admitted that because of ongoing domestic violence, the child was at risk of harm in her care. On the basis of respondent's admissions, the court took jurisdiction over the child. During the dispositional hearing that followed, respondent was ordered to comply with and benefit from a case service plan designed to address respondent's substance abuse, domestic violence issues, parenting skills, and housing insecurity. Approximately 2½ years into the treatment plan, much more than 182 days after entry of the initial dispositional order, DHHS filed a supplemental petition seeking termination of respondent's parental rights. The petition alleged that respondent failed to benefit from the services offered.

During the review hearings held over 2½ years, and during the October 2022 termination hearing, DHHS presented evidence that respondent did not substantially comply with or benefit from her treatment plan. Indeed, despite that the child was briefly returned to respondent's home in September 2021, respondent never truly progressed to a point where the child would be safe in her care. The evidence also established that there was no reasonable likelihood that respondent would be in a position to safely and appropriately parent her child within a reasonable time.

The record clearly and convincingly demonstrates that respondent was unable to overcome the most significant barrier to reunification, namely, her substance abuse issues. Several documents noted respondent's admission that she had abused cocaine for at least two decades. Respondent's substance abuse was a major factor that brought the child into care. DHHS provided respondent with services designed to address her substance abuse issues, including a substance

abuse assessment, substance abuse therapy, random drug screens, and Family Assistance Program services. In 2022, respondent also spent 2½ months in an in-patient substance abuse rehabilitation facility as part of a criminal case. Despite these services, there was no credible evidence that respondent was able to overcome this substantial barrier to reunification. Indeed, clear and convincing evidence demonstrated that respondent continued to abuse substances while her child was a temporary ward of the court and made no meaningful effort to lead a substance-free lifestyle.

Throughout the case, respondent regularly tested positive for substances such as hydrocodone and amphetamines. Respondent consistently testified and argued that she had a valid prescription for medications that would yield these positive findings in a drug screen. The medications were allegedly prescribed for treatment of respondent's attention deficit hyperactivity disorder and back pain. At one point, respondent presented a hand-written note from her primary care physician that simply stated: "patient is prescribed Norco & Amphetamine monthly which explains positive opiates & amphetamine on drug screen." Moreover, respondent testified on multiple occasions that she was taking her medications as prescribed. This theme persisted throughout the court proceedings. For many months, the court seemed to accept the representation that the positive drug screens were consistent with respondent taking her medications as prescribed. Little was made of the fact that the doctor's note never addressed whether the proper use of the prescribed medications would yield the levels seen in the drug screens.

There was, however, clear and convincing evidence that respondent had been concealing her addiction to prescribed opioids. Even until the final moments of the termination hearing, respondent argued that she was taking her medications as prescribed. But this testimony was inconsistent with respondent's statements to medical professionals and contradicted testimony she had given earlier. Respondent was jailed from November 16, 2021, until February 1, 2022. At the February 8, 2022 review hearing, she testified that she realized while incarcerated that she had an opioid addiction. Between February 2, 2022, and April 13, 2022, respondent was admitted to an in-patient substance abuse facility. The admission report noted that respondent had acknowledged using cocaine for approximately 19 years and also conceded that she had abused her prescribed medications. During the intake, respondent indicated a preference for "high-intensity residential treatment" because she did not feel she had "the skills to maintain sobriety outside of residential." The clinician concluded that respondent had "a drug problem of substantial concern." This evidence clearly supported a conclusion that respondent was not taking her medications as prescribed. Indeed, there was clear and convincing evidence that respondent was abusing her prescription medications and, in fact, was addicted to them.

Moreover, at the time the trial court terminated respondent's parental rights, there was no credible evidence that respondent had overcome her addiction. After respondent completed the in-patient treatment program in April 2022, Hope House staff recommended that she participate in an intensive outpatient program. Consistent with this recommendation, in mid-April 2022, DHHS referred respondent to Community Mental Health ("CMH") for outpatient substance abuse treatment. McCullough Vargas & Associates was the designated provider. Respondent completed the CMH intake process and attended four of the group sessions, but she then failed to continue with the services. She was terminated from the treatment program in July 2022 for noncompliance. Apparently, respondent did not comply with this referral because she decided that she and the treatment provider were not a "good fit." Respondent then decided to transfer her substance abuse treatment to Catholic Charities, but because she did not cooperate with the original referral and

instead elected to pursue a different avenue for treatment, she did not actually start treating with a therapist at Catholic Charities until October 3, 2022, the day before the termination hearing. Respondent did not successfully address her opioid addiction when she refused to timely participate in the recommended intensive outpatient treatment.

Respondent's failure to cooperate in weekly random drug screens was further evidence that she had not overcome her substance abuse issues. For the overwhelming majority of the case, respondent did not consistently submit to requested screens. Most significant is that she did not substantially comply with the drug testing during the six months preceding the termination of her parental rights. In April and May 2022, respondent intermittently submitted to drug testing. During this two-month period, she tested positive for benzodiazepines on five occasions. In May 2022, she tested positive for morphine. Then, respondent did not screen at all during the month of June 2022. Respondent claimed that she missed screens at the end of May and all of June 2022 because she fell into a depression and did not want to leave her home. At the October 4, 2022 termination hearing, evidence was presented that between June 28, 2022, and September 26, 2022, respondent was required to participate in 37 drug screens. She completed only 11 screens during this period and "no-showed" for 26 screens. Accordingly, there was clear and convincing evidence that despite almost three years of services, respondent did not overcome her substance abuse issues.

The case service plan also required respondent to obtain and maintain suitable housing and a legal source of income. Respondent did not comply with these components of her treatment plan. At the time the child came into care, respondent was on the verge of an eviction. During these proceedings, she was similarly evicted from an apartment for nonpayment of rent. At the October 4, 2022 termination hearing, respondent testified that she had been living at a homeless shelter for a month. Although she was looking for housing with the assistance of an agency, she had "no clue" when she might find a home suitable for her and the child. In light of this testimony, there was clear and convincing evidence that at the time of termination, respondent still did not have stable and suitable housing for her child.

The evidence also supported a finding that respondent, despite fully capable of working, did not have adequate employment. Respondent reported having several jobs through the duration of the case, but she did not provide documentation verifying her employment. A caseworker testified that respondent rarely held any employment for more than a month. At the termination hearing, respondent testified that she had been employed at a fast-food restaurant for approximately a month. But this was her second job during the reporting period. From this record, the trial court could conclude that respondent had not obtained and maintained suitable employment such that she would be in a position to financially support her child and provide for his needs.

The foregoing evidence clearly and convincingly demonstrated that at the time of termination, the conditions that led to the adjudication continued to exist. Further, the record clearly established that there was no reasonable likelihood that respondent would be in a position to safely parent her child within a reasonable time. CPS offered respondent preventative services before filing the petition. After the petition was filed, the court ordered respondent to comply with a treatment plan. Respondent had approximately three years to make meaningful changes in her life, but she did not take advantage of any of the opportunities provided to her. Respondent failed

to adequately address the barriers to reunification. She simply refused to participate in and benefit from the treatment plan. Further, because she was unwilling or unable to make meaningful changes, there was clear and convincing evidence from which the court could conclude that the conditions that led to the adjudication would not be rectified within a reasonable time.

Termination of parental rights under § 19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams,* 286 Mich App 253, 272; 779 NW2d 286 (2009). DHHS met this evidentiary burden by clear and convincing evidence. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under § 19b(3)(c)(*i*). Considering the same evidentiary record, the court also did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under § 19b(3)(j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

## B. REASONABLE EFFORTS

Next, respondent argues that the trial court erred by terminating her parental rights because DHHS failed to make reasonable efforts to reunite her with the child. We review for clear error a trial court's finding that "reasonable efforts were made to preserve and reunify the family." *In re Fried,* 266 Mich App 535, 542-543; 702 NW2d 192 (2005).

Generally, before a court may contemplate termination of a parent's parental rights, DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). The purpose of the case service plan is to facilitate the return of the children to their parents. *In re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010). DHHS's statutory duties to update a parent's service or treatment plan and provide the parent with necessary and relevant reunification services continue throughout the case. *Id.* "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009). After reviewing the record, it is readily apparent that DHHS made reasonable efforts to reunify respondent with her child and that the termination of respondent's parental rights was a product of her failure to participate in and benefit from the treatment plan rather than the adequacy of DHHS's efforts.

During the three years that the child was a ward of the court, respondent was offered a multitude of services to remove the barriers to reunification. The services included, but were not limited to, substance abuse assessment and treatment, drug screening, parenting time, parenting classes, domestic violence counseling, mental health referrals, referral to the Family Assistance Program, a parenting aid, transportation assistance, family team meetings, and case management. When the child was briefly returned to the home between September 2021 and November 2021, respondent received hands-on assistance through the Family Reunification Program. The criminal court system also provided respondent with the opportunity to benefit from in-patient substance abuse treatment. Despite these services, respondent failed to meaningfully participate in and

benefit from the services offered. Consequently, respondent could never demonstrate that she was able to parent her child or that the child would be safe in her care.

Respondent argues, however, that DHHS should have provided her and the child with attachment-based family therapy. It is presumed that respondent is relying on the recommendation from the clinicians who performed the child's trauma assessment. After the trauma assessment, the clinicians concluded that the child had an insecure-avoidant attachment to respondent. Among several recommendations, including that respondent participate in and benefit from her treatment plan, the clinicians recommended that attachment-based family therapy (ABFT) "occur prior to reunification to assist with the transition." This recommendation presupposed that respondent would progress to a point where reunification was warranted. Respondent, however, never reached a level of progress where reunification was justified or prudent. Indeed, even when the child was briefly returned to the home in the fall of 2021, such a move, in retrospect, was contraindicated. Moreover, respondent did not comply with many of the services to which she was already referred, so it is unlikely that she would have meaningfully participated in ABFT had it been offered. This is particularly evident considering that respondent could not overcome her drug addictions.

Contrary to respondent's assertions, the record shows that DHHS made the referrals necessary to assist respondent in removing the barriers to reunification. Unfortunately, respondent refused to participate in and benefit from the services offered. DHHS is not required to offer every conceivable service before termination of parental rights may be ordered. See MCL 712A.18f; MCL 712A.19. Accordingly, there is no merit to respondent's claims that DHHS failed to make reasonable efforts to reunify her with her child.

C. BEST INTERESTS

Respondent also challenges the trial court's finding that termination of her parental rights was in the child's best interests. We find no error in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court should consider a wide variety of factors. *In re White,* 303 Mich App at 713. These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen,* 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White,* 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App 76, 87; 836 NW2d 182 (2013). As noted earlier, DHHS must

prove by a preponderance of the evidence that termination of parental rights is in a child's best interests, and we review for clear error a trial court's finding on the issue. *In re Mota*, 334 Mich App at 320.

Respondent asserted below that termination of her parental rights was not appropriate because a bond existed between her and the child. The trial court considered the nature of the bond and concluded that it did not weigh in favor of preserving respondent's parental rights. The court's finding is supported by a preponderance of the evidence.

The clinician performing the child's trauma assessment found that the child had an insecure-avoidant attachment to respondent. The clinicians explained in their report that this type of attachment suggested that the child may subconsciously believe that respondent will probably not be able to meet his needs. The clinician also found during the assessment that respondent demonstrated minimal ability to encourage interactive engagement. This evidence indicates that any bond that may have existed between respondent and the child was not healthy or secure. Accordingly, the trial court properly concluded that this factor weighed in favor of terminating respondent's parental rights.

The trial court also correctly found that respondent's failure to meaningfully participate in and benefit from the treatment plan was a factor that weighed in favor of termination. Because respondent did not benefit from the services offered, substance abuse and housing insecurity remained as primary barriers to reunification. Accordingly, a preponderance of the evidence supported the court's finding that the child would be at risk of harm if returned to respondent's care. Therefore, respondent's noncompliance with the case service plan was a factor that weighed in favor of terminating respondent's parental rights.

The court also considered the child's need for security and stability. The report from the trauma assessment succinctly articulated the importance of this best-interest factor. In a summary of their findings, the clinicians stated: "Overall, [the child] has experienced trauma, which impacts many areas of his functioning. To help him continue to overcome his trauma history, he needs consistency, security, support, love, nurture, and a safe space." Accordingly, a preponderance of the evidence supported the trial court's finding that respondent, because of her substance abuse, could not provide the child with the stability and permanence he required.

By contrast, the child's maternal aunt was providing him with stability and permanence. The testimony established that this relative's home was safe, secure, and provided the child with the routine and structure he needed. In addition, the caregiver ensured that the child received the treatment he required to improve his emotional and psychological well-being. Further, the maternal aunt was willing to adopt the child should the court terminate respondent's parental rights. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012). Further, the trial court may also consider the possibility of adoption. *In re White,* 303 Mich App at 713-714. In this case, a preponderance of the evidence demonstrated that the maternal aunt's home was preferable to respondent's home because it would provide the child with the care he required to facilitate his continued growth and development.

The court did recognize that the child, seven years old at the time of termination, had consistently expressed a desire to return to respondent's care. Further, over the three years that the child was a ward of the court, respondent consistently attended parenting time and, by all accounts, the visits went well. Respondent routinely brought food, drinks, and an activity to the visits. Although these factors likely weighed in favor of preserving respondent's parental rights, they did not outweigh the child's need for safety and security and to be raised in a drug-free environment.

Considering the foregoing, on balance, the relevant factors weighed in favor of terminating respondent's parental rights. Termination would provide an avenue by which the child could achieve the stability, finality, and permanence he required. The trial court acknowledged that the child's placement with the maternal aunt weighed in favor of reunification, but it went on to properly balance relative placement with other relevant factors. Even though placement with a relative weighs against termination, and such a placement must be considered, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court properly balanced relevant factors and it did not clearly err by finding that termination of respondent's parental rights was in the child's best interests despite his relative placement.

D. ICWA AND MIFPA

Respondent also argues that there is no evidence that the trial court complied with the notice provisions of ICWA and MIFPA. DHHS concedes that the trial court did not insure compliance with the relevant statutes and that conditional reversal is required. We agree.

Although respondent did not raise this issue below, the provisions of ICWA and MIFPA are "mandatory, regardless of how late in the proceedings a child's possible Indian heritage is uncovered." *In re TM,* 245 Mich App 181, 188; 628 NW2d 570 (2001) (quotation marks and citations omitted), overruled on other grounds by *In re Morris*, 491 Mich 81, 115 n 26; 815 NW2d 62 (2012). Accordingly, it is necessary to consider this issue.

Both ICWA and MIFPA were enacted in an effort to "protect[] the best interests of [American] Indian children and promot[e] the stability and security of [American] Indian tribes and families." *In re England*, 314 Mich App 245, 251; 887 NW2d 10 (2016) (quotation marks and citation omitted). The notice provisions of ICWA and MIFPA require, in general, that a tribe be notified "when there are sufficient indications that [a] child may be an [American] Indian child . . . ." *In re Morris*, 491 Mich at 100. Specifically, ICWA requires that the relevant Indian tribe be notified by registered mail, return receipt requested, where there is "reason to know" that an Indian child may be involved in the child protective proceeding. 25 USC 1912(a). The "reason to know" standard has been held to "set a rather low bar" for triggering the notice requirement. *In re Morris*, 491 Mich at 105. In other words, "sufficiently reliable information of virtually any criteria on which membership might be based is adequate to trigger the notice requirement[.]" *Id.* at 108. The Court in *Morris* indicated that "indicia sufficient to trigger tribal notice includes situations in which (1) the trial court has information suggesting that the child, a parent of the child, or members of a parent's family are tribal members, [or] (2) the trial court has information indicating that the child has Indian heritage, even though no particular Indian tribe can be identified[.]" *Id.* at 108 n 18.

-9-

At the November 18, 2019 preliminary hearing, the CPS worker was asked about respondent's Indian heritage. The transcription from the hearing indicates that the worker's response was "inaudible." Later in the hearing, however, the worker answered in the affirmative when asked if, going forward, she would be investigating the child's Native American heritage. The worker testified that in the interim, they would be using "active efforts" to reunify respondent with her son. During this November 18, 2019 hearing, the court authorized the petition. In the corresponding order that followed, boxes were checked that indicated: "The child is Indian as defined in MCR 3.002(12)" and that "the petitioner has not given notice of the preliminary hearing as required by MCR 3.920(C)(1)." Immediately after the court authorized the petition, respondent entered a plea of admission to several of the allegations in the petition. During the plea proceedings, respondent's Indian heritage was again raised and asserted. Thereafter, the court and the parties agreed that Paragraph 20 of the petition would be amended to read that "there is Native American Heritage."

At the December 11, 2019 dispositional hearing, respondent's Indian heritage was again raised. At that time, the foster-care worker testified that before her agency received the case, the CPS worker "sent out all the stuff" to the tribes. She further testified that she did not believe that the proofs of service had been filed with the court, but that she was willing to do so. In any event, the worker indicated that the tribes had not yet responded to the notices.

In February 2022, the trial court ordered that case management be moved from the Samaritas agency back to DHHS. The first review hearing after the issuance of this order was held on April 26, 2021. The court report prepared by the DHHS worker in anticipation of the review hearing included a statement that "[r]esponse letters were received from Eastern Band of Cherokee Indians dated January 27, 2020 and Cherokee Nation dated 04/29/20 and [the child] is not registered or eligible to register with these tribes." This was the first reference to possible Native American heritage since the topic was briefly referenced at the December 11, 2019 dispositional hearing. DHHS has attached to its brief on appeal correspondence from the Eastern Band of Cherokee Indians and the Cherokee Nation, but these documents do not appear in the lower court record. Further, there is no evidence in the record that DHHS properly served notice on these two entities, or on the United Keetoowah Band of Cherokee Indians in Oklahoma, an additional entity referenced in the documents.

Respondent informed DHHS and the courts that she had Native American heritage. Accordingly, the court had "information suggesting that the child, a parent of the child, or members of a parent's family [were] tribal members[.]" *In re Morris*, 491 Mich at 108 n 18. Therefore, the notice requirements of 25 USC 1912(a) and MCL 712B.9(1) were triggered. But there is nothing in the record to confirm that steps were taken to satisfy the notice requirements of 25 USC 1912(a) and MCL 712B.9(1). DHHS has acknowledged these omissions.

In *In re Morris,* the Supreme Court held that the proper remedy for ICWA-notice violations is to conditionally reverse the trial court's order terminating parental rights and remand for resolution of the ICWA-notice issues. *In re Morris,* 491 Mich at 122. It would appear from representations made by DHHS in its brief on appeal that the lower court is already in the process of addressing the lack of proper notice. Accordingly, because we conclude that the trial court otherwise properly terminated respondent's parental rights, we conditionally reverse the trial court's order terminating respondent's parental rights and remand the matter to the trial court. On

remand, the trial court should first ensure that notice was properly made to the appropriate entities. If the trial court then determines that ICWA and MIFPA do not apply to the proceedings, either because the child is not an Indian child or because the properly-noticed tribes did not respond within the allotted time, the trial court's order terminating respondent's parental rights shall be reinstated. *Id.* at 123. If, however, the trial court concludes that ICWA or MIFPA does apply to this child protective proceeding, the trial court's termination order must be vacated and all proceedings must begin anew in accordance with the procedural and substantive requirements of the statutes. See *id.*

We conditionally reverse the trial court's order terminating respondent's parental rights and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey